UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DAVIDCO INVESTORS, LLC
individually and on behalf of all others
similarly situated,

       Plaintiffs,

v.

ANCHOR GLASS CONTAINER
CORPORATION, ET AL.,

       Defendants.
_____/

Case No. 8:04-cv-2561-T-24 EAJ
**LEAD CASE**

## ORDER

This cause comes before the Court on Defendants' motions to dismiss and memorandums in support (Doc. No. 51, 52, 56, 57, 58, 59, 62, 63), Plaintiffs' responses in opposition (Doc. No. 82, 93, 101, 107, 110), and Defendants' reply briefs (Doc. No. 90, 91, 92, 96, 102, 109, 112). The Court held a hearing on these motions on February 17, 2006.

## I.  Standard of Review for a Motion to Dismiss

In deciding a motion to dismiss, the district court is required to view the complaint in the light most favorable to the plaintiff.  See Murphy v. Federal Deposit Ins. Corp., 208 F.3d 959, 962 (11th Cir. 2000)(citing Kirby v. Siegelman, 195 F.3d 1285, 1289 (11th Cir. 1999)).  A complaint should not be dismissed for failure to state a claim upon which relief can be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  The Federal Rules of Civil Procedure "do not require a claimant to set out in detail the facts upon which he

bases his claim." Id. at 47.  All that is required is "a short and plain statement of the claim."  Fed.

R. Civ. P. 8(a)(2).  The standard on a 12(b)(6) motion is not whether the plaintiff will ultimately

prevail in his or her theories, but whether the allegations are sufficient to allow the plaintiff to

conduct discovery in an attempt to prove the allegations.  See Jackam v. Hospital Corp. of Am.

Mideast, Ltd., 800 F.2d 1577, 1579 (11th Cir. 1986).

## II. Background

This is a securities action brought under Sections 11 and 15 of the Securities Act of 1933

and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934.  Plaintiffs allege the

following in their Consolidated Amended Class Action Complaint (Doc. No. 28): Anchor Glass

Container Corporation ("Anchor") is a glass bottle maker.  (¶ 2).  On March 15, 2002, as part of

Anchor's second bankruptcy, Anchor entered into a Reorganization Agreement with Cerberus

Capital Management, L.P. ("Cerberus") that provided for Cerberus to invest $100 million into

Anchor, of which $75 million was an investment in 100% of Anchor's series C participating

preferred stock, and $5 million was an investment in nearly all of Anchor's common stock.[1]  (¶

7, 45).  On April 15, 2002, Anchor filed its proposed plan of reorganization.  (¶ 8).  The plan of

reorganization transferred stock ownership in Anchor to Cerberus and its related entities.  (¶ 8).

When Cerberus invested in Anchor, it fully intended to take Anchor public and thereby recoup its

investment and earn an immediate profit while continuing to control Anchor.  (¶ 12).

Merrill Lynch & Co. ("Merrill Lynch") and PricewaterhouseCoopers LLP ("PwC") were

financial advisors to Anchor in connection with the proposed plan of reorganization.  (¶ 10, 11).

---

[1]The Court notes that Plaintiffs allege that Cerberus obtained 100% of the common stock
in parts of the complaint, but Plaintiffs also allege that Cerberus obtained slightly less than 100%
of the common stock in other parts of the complaint.  (Doc. No. 28, ¶ 45, 49).

Before PwC was engaged by Anchor as its financial advisor, PwC had been engaged to help conduct due diligence for Anchor's new equity owner, Cerberus. (¶ 11).

### A. The Prospectus and Offering

On September 9, 2003, Anchor issued a prospectus in connection with the September 25, 2003 initial public offering ("the Offering"). (¶ 30, 46). A total of 8,625,000 shares of common stock were sold for $127.7 million. (¶ 47). After the Offering, Anchor had 23,382,343 shares outstanding.[2] (¶ 47). Anchor used $85.3 million of the net proceeds of the Offering to redeem all of the series C preferred stock, which allowed Cerberus to make a $10 million profit on its purchase of Anchor's series C preferred stock thirteen months earlier. (¶ 48).

According to the prospectus, Cerberus-related entities owned 12,371,859 shares, or 91.6%, of Anchor's common stock and 96.87% of Anchor's series C participating preferred stock at the time of the Offering. (¶ 49). Furthermore, the prospectus stated that after consummation of the Offering, Cerberus-related entities would own 62.78% of Anchor's common stock. (¶ 49).

### B. Overview of Anchor's Alleged Misstatements and Omissions

Plaintiffs allege that the prospectus issued in connection with the September 25, 2003 Offering misrepresented and omitted material facts. (¶ 30). Specifically, Plaintiffs contend that the financial statements incorporated into the prospectus were false and misleading because they

---

[2]The Prospectus disclosed that: (1) Cerberus International, Ltd. owned approximately 4,801,978 shares of Anchor's common stock and approximately 28,210 shares of Anchor's series C participating preferred stock; (2) Cerberus Institutional Partners, L.P. owned approximately 5,678,827 shares of Anchor common stock and approximately 33,344 shares of Anchor's series C participating preferred stock; and (3) Cerberus Institutional Partners (America), L.P. owned approximately 741,058 shares of Anchor common stock and approximately 4,352 shares of Anchor series C participating preferred stock. (¶ 49).

(1) overstated Anchor's cash flow, (2) overstated the value of the assets of the Connellsville plant, (3) overstated Anchor's shareholders' equity, (4) failed to disclose the contingent liabilities, risks, and uncertainties that the loss of the Rolling Rock contract would cause.  (¶ 31).

### 1. Operating Cash Flow

Anchor stated in its 2004 Form 10-K, filed March 29, 2005, that the financial statements included in the prospectus materially overstated the amount of cash flow from operations.  (¶ 55). For example, Anchor's audited financial statements for the eight months ending August 31, 2002 and the four months ending December 31, 2002 included in the prospectus overstated the amount of cash its operations generated by approximately 57% and 16%, respectively.  (¶ 55).  Similarly, Anchor's unaudited financial statements for the six months ending June 30, 2003, which were included in the prospectus, understated the amount of cash its operations used by approximately 15.4%.  (¶ 55).

Plaintiffs contend that Anchor has admitted that its cash flow from operations was overstated, as follows: (1) during the nine months ending September 30, 2003, Anchor understated the amount of cash its operations used by 23.2%; (2) during the year ending December 31, 2003, Anchor overstated the amount of cash its operations generated by 21.1%; (3) during the six months ending June 30, 2004, Anchor overstated the amount of cash its operations generated by 29.4%; and (4) during the nine months ending September 30, 2004, Anchor reported that its operations generated $1.2 million in cash when its operations actually used $2.3 million in cash.  (¶ 59).  Plaintiffs contend that Anchor's cash flow generated from its operations was a material factor in assessing Anchor's value and was critical to investors' assessment of Anchor's ability to service its debt, which totaled hundreds of millions of dollars.  (¶ 57).

4

## 2. Connellsville Plant

On August 8, 2002, the Latrobe Brewing Company ("Latrobe") informed Anchor that it would not renew its long-term contract with Anchor. (¶ 13). Under its contract with Latrobe, Anchor had manufactured green glass bottles for Rolling Rock beer and spray painted Rolling Rock's distinctive white label directly onto the green glass bottles. (¶ 14). The Rolling Rock glass bottles were manufactured and labeled at Anchor's plant in Connellsville, Pennsylvania. (¶ 14). The Rolling Rock contract accounted for 50% of the Connellsville plant's production and sales. (¶ 15). Anchor had no other prospects to replace the Rolling Rock contract, and it never replaced the contract. (¶ 15).

Plaintiffs contend that the loss of the Rolling Rock contract was a triggering event under generally accepted accounting principles ("GAAP") that required Anchor to determine whether the value of the Connellsville plant and equipment was impaired. (¶ 16). Plaintiffs contend that the Connellsville plant was impaired when it lost the Rolling Rock contract because (1) the plant's extensive equipment used to spray paint the Rolling Rock bottles became an impaired asset, since the packaging and labeling was unique to Rolling Rock and not used by any other beer breweries; and (2) there were no alternative customers in proximity to the plant[3] that could replace the lost Rolling Rock business. (¶ 16).

Plaintiffs contend that announcing the impairment of one of Anchor's nine plants would have negatively affected Cerberus' plans to take Anchor public. (¶ 17). Therefore, when Anchor

---

[3]Plaintiffs point out that in the prospectus, Anchor states: "Our manufacturing facilities are generally located in geographic proximity to our customers due to the significant cost of transportation and the importance of prompt delivery to customers. Most of our production is shipped by common carrier to customers within a 150-mile radius of the plant at which it was produced." (Doc. No. 28, p. 29-30, n.3)

filed the prospectus, it failed to mention that the Connellsville plant and equipment were impaired. (¶ 18, 19). In the prospectus, Anchor's financial statements disclosed:

> Effective January 1, 2002, the Company adopted Statement of Financial
> Accounting Standards No. 144—Accounting for the Impairment or Disposal of
> Long-Lived Assets ("SFAS 144"), that addresses financial reporting for the
> impairment or disposal of long-lived assets. . . . The Company evaluates the
> recoverability of its long-lived assets whenever adverse events or changes in
> business climate indicate that the expected undiscounted future cash flows from
> the related asset may be less than previously anticipated. If the net book value of
> the related asset exceeds the undiscounted future cash flows of the asset, the
> carrying amount would be reduced to the present value of its expected future cash
> flows and an impairment loss would be recognized. The Company concluded that
> no impairment exists as of December 31, 2002.

(¶ 63).

However, on November 5, 2004, Anchor announced that it would close its Connellsville plant. (¶ 61). In connection with the closing, Anchor's financial statements for the quarter ending September 30, 2004 filed on November 12, 2004 with the SEC on Form 10-Q, disclosed:

> At a meeting held November 4, 2004, the Board decided to close the 624,000
> square foot Connellsville, Pennsylvania facility. Production was terminated
> effective as of the close of business on November 4. The Company expects to
> complete plant closure activities within twelve months. Approximately 300
> employees will be affected.
>                     *       *       *
> The Company will record restructuring expenses and other related charges that
> will, in total, approximate $47 to $57 million. These charges include
> approximately $2 million for a company-wide reduction in force, in addition to
> Connellsville, as a result of management's evaluation of personnel costs. Of this
> total, $44 to $51 million will be recorded in the fourth quarter of 2004.

(¶ 61).

Of the $47 - $57 million in restructuring expenses, Anchor stated in the Form 10-Q that $25 million would consist of a noncash write down of property and equipment, and $4 to $10 million would consist of a noncash write down of inventories. (¶ 61). Plaintiffs contend that in

violation of GAAP, Anchor improperly delayed the recognition of the impairment in the values of certain inventory, property, and equipment until it closed its Connellsville plant, causing Anchor's operating results to be materially overstated prior to the write-down. (¶ 62). Plaintiffs base this conclusion on their allegation that Rolling Rock beer bottle production represented 50% of the Connellsville plant's business and that after Anchor lost the contract, operations at that plant declined dramatically. (¶ 68). Furthermore, Plaintiffs contend that when Anchor lost the Rolling Rock contract, the Connellsville plant had no prospect of returning to its previous level of profitability, because (1) the Rolling Rock contract occupied two of the plant's four glass making shops on a full-time basis during the term of the contract; and (2) there were no potential customers in proximity to the Connellsville plant that could generate comparable volume requirements. (¶ 71). As such, Plaintiffs allege that these changes in circumstances indicate that the reported value of Anchor's Connellsville plant and equipment was impaired even before the Offering. (¶ 70).

Additionally, Plaintiffs contend that Anchor's financial statements, beginning at least with the six month period ending June 30, 2003 included in the prospectus, violated GAAP by failing to disclose Anchor's contingent liabilities regarding the loss of the Rolling Rock contract. (¶ 79). The prospectus disclosed that "In 2002, we lost a customer responsible for approximately 3.9% of our 2001 net sales." (¶ 76). The prospectus then stated that Anchor was "able to replace these sales." (¶ 76). Plaintiffs contend that the customer referred to in this disclosure is Rolling Rock, but the replacement sales referred to were company-wide sales. (¶ 76). There was no disclosure of the effect the loss of Rolling Rock would have on Anchor's asset values, such as its manufacturing plant, inventory and equipment at the Connellsville plant. (¶ 76). Plaintiffs

7

contend that this disclosure was materially misleading because it gave investors a false impression about the risks associated with the lost Rolling Rock contract. (¶ 76). Plaintiffs contend that the closure of the Connellsville plant was a contingent liability that should have been disclosed in the prospectus. (¶ 76).

Furthermore, Plaintiffs contend that the loss of the Rolling Rock contract was compounded by the loss of the Yuengling Beer account. (¶ 75). In early 2003, Yuengling Beer decided that, due to quality problems with the bottles from Connellsville, it would not take any more product from that plant. (¶ 75). Plaintiffs contends that the loss of Yuengling Beer, combined with the loss of Rolling Rock, marked the elimination of the Connellsville plant's entire customer base that was unique and proximate to Connellsville. (¶ 75).

### 3.  Anchor's Series C Preferred Stock

As part of its bankruptcy reorganization, Anchor issued 75,000 shares of its series C participating preferred stock at a $1,000 per share to Cerberus. (¶ 84). The prospectus included audited financial statements for the four months ending December 31, 2002 and unaudited financial statements for the six months ending June 30, 2003. (¶ 87). Plaintiffs contend that in violation of GAAP and the SEC's accounting rules and regulations, Anchor, as it has now admitted in SEC disclosures filed after the Offering, improperly included the issuance of its series C participating preferred stock as part of its shareholders' equity on its financial statements. (¶ 87, 92). As a result, Anchor's shareholders' equity in the prospectus was materially overstated. (¶ 87, 92).

Specifically, Plaintiffs allege that the prospectus stated that Anchor's shareholders' equity on December 31, 2002 was $76.5 million. (¶ 93). However, its true shareholders' equity on such

date totaled only $1.5 million. (¶ 93). Similarly, the prospectus stated that Anchor's shareholders' equity on June 30, 2003 totaled $60.4 million when it actually had a shareholders' deficit of $14.6 million. (¶ 93.)

On November 3, 2003, Anchor issued a press release announcing its financial results for the third quarter of 2003, in which it stated:

> Anchor will restate the balance sheets in its 10-K report for 2002 and its 10-Q reports for the first two quarters of 2003 to reflect the change in classification of its Series C Redeemable Preferred Stock, which is no longer outstanding, to outside of permanent equity. The balance sheet restatement will have no effect on the Company's statement of operations, earnings per share, assets or cash flows for any periods. Total liabilities will be reduced to reflect the change in classification of accrued dividends from liabilities to part of the Series C Redeemable Preferred Stock. Because of the prior redemption of the Series C Preferred Stock, the change in classification has no impact on the Company's balance sheet as of September 30, 2003.

(¶ 121).

## C. Deneau and Campbell's Sale of Stock

On May 6, 2004, Anchor executives Richard Deneau[4], Darrin Campbell[5], and Peter Reno[6] held a conference call with analysts before the market opened for trading to discuss Anchor's first quarter 2004 results. (¶ 139). Campbell and Deneau presented very strong positive news about Anchor, its sales for the first quarter of 2004, and its high expectations for the remainder of the year. (¶ 139).

---

[4]Deneau became President and Chief Operating Officer of Anchor in July 1997 and a Director in 1998. He became Chief Executive Officer of Anchor in August 2002, and he resigned from that position on November 4, 2004. (¶ 35).

[5]Campbell became Executive Vice President (Sales and Asset Management) of Anchor in September 2001, and he became Chief Financial Officer of Anchor in November 2002. (¶ 35).

[6]At some point in time, Reno was the Vice-President of Finance for Anchor and then later became Chief Financial Officer of Anchor. (¶ 147).

However, seven days later, on May 13, 2004, Deneau and Campbell sold a total of

150,000 shares of their Anchor common stock at $14.50 per share, for total proceeds of

$2,175,000:

| Name | Date | Shares | Price | Proceeds |
|------|------|--------|-------|----------|
| Deneau | 5/13/04 | 100,000 | $14.50 | $1,450,000 |
| Campbell | 5/13/04 | 50,000 | $14.50 | $ 725,000 |

(¶ 140).  The Forms 4 filed with the SEC show that on May 13, 2004: (a) Deneau sold 100,000 of

his 344,250 shares or approximately 30% of his common stock, and (b) Campbell sold 50,000 of

his 182,250 shares or 27% of his common stock.  (¶ 141).

### D.  November 5, 2004 Press Release

On November 5, 2004, before the market opened, Anchor issued a press release

announcing a large third quarter 2004 loss and Deneau's retirement.  (¶ 151).  In the press

release, Anchor stated:

> Third quarter 2004 net sales decreased to $186.2 million from $193.5 million in
> the prior year. Third quarter 2004 net loss was $5.9 million versus $4.3 million in
> the prior year. Loss applicable to common stockholders was $5.9 million, or
> $(0.24) per share, versus third quarter 2003 loss applicable to common
> stockholders of $44.9 million (including $38.1 million for the redemption of
> Series C preferred stock following the company's September 2003 initial public
> offering), or $(3.20) per share.

*     *     *

> Additionally, in order to enter 2005 with lower inventory levels and to better align
> production with customer requirements, Anchor Glass plans to curtail production
> selectively during the fourth quarter. The company anticipates that this temporary
> production curtailment will negatively impact fourth quarter earnings by $4-6
> million.

*     *     *

> As a result of the above actions, the company will take a restructuring charge of $47 to $57 million comprised of the following: a $45 to $55 million charge for asset impairment, severance and other facility exit costs associated with Connellsville; and approximately $2 million related to severance costs associated with the general reduction in force. Of this total, $44 to $51 million will be recorded in the fourth quarter.

(¶ 151).  Anchor's stock price dropped 27% on the news, from a close on November 4, 2004 of

$7.94 to a closing price of $5.80 on November 5, 2004.  (¶ 152).

Later the same day, on November 5, 2004, Anchor issued another press release

elaborating on the Connellsville plant closing, stating:

> Anchor Glass Container Corporation (NASDAQ:AGCC) today announced that, at its meeting on November 4th, the board of directors decided to close the Connellsville, Pennsylvania facility. . . .The Board made this decision taking into consideration the excess supply conditions currently prevailing in the glass container industry and the company's analysis of the economics of each Anchor Glass facility. This analysis is part of an ongoing and comprehensive operational review begun in the third quarter to increase the company's asset productivity and free cash flow.

(¶ 153).

### E.  Plaintiffs' Claims

Plaintiffs assert four claims in their amended complaint: (1) Count I: Section 11 claim

under the Securities Act of 1933 ("Section 11 Claim") against Anchor,[7] Anchor's executives and directors who signed the prospectus in connection with the Offering,[8] the underwriters of the Offering,[9] and the accounting firm, PwC; (2) Count II: Section 15 claim under the Securities Act of 1933 ("Section 15 Claim") against Campbell, Deneau, and the Cerberus Defendants[10]; (3) Count III: Section 10(b) claim under the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder ("Section 10(b) and Rule 10b-5 Claim") against Anchor, Campbell, Deneau, and Reno; and (4) Count IV: Section 20(a) claim under the Securities Exchange Act of 1934 ("Section 20(a) Claim") against Campbell, Deneau, Reno, Cerberus Capital Management, L.P., Cerberus Institutional Partners, L.P., Cerberus Institutional Partners (America), L.P., and

---

[7]Plaintiffs' claims against Anchor are stayed due to Anchor filing for bankruptcy again on August 8, 2005. (Doc. No. 77).

[8]These executives and directors consist of Darrin Campbell, Richard Deneau, Joel Asen, James Chapman, Jonathan Gallen, George Hamilton, Timothy Price, Alan Schumacher, and Lenard Tessler.

[9]The underwriters consist of Credit Suisse First Boston, Merrill Lynch, and Lehman Brothers.

[10]The Cerberus Defendants consist of Cerberus Capital Management, L.P., Cerberus International, Ltd., Cerberus Institutional Partners, L.P., Cerberus Institutional Partners (America), L.P., and Stephen Feinberg.
Feinberg is the founder and principal owner of Cerberus, according to Anchor's SEC filings, and beneficial owner of Anchor common stock. (¶ 44). Furthermore, the prospectus stated: "Stephen Feinberg exercises sole voting and investment authority over all securities of [Anchor] owned by Cerberus International, Ltd., Cerberus Institutional Partners, L.P. and Cerberus Institutional Partners (America), L.P. In addition, certain private investment funds and managed accounts, for which Stephen Feinberg exercises voting and investment authority, own in the aggregate approximately 1,149,996 shares of [Anchor] common stock and 6,750 shares of [Anchor] series C participating preferred stock. Thus, pursuant to Rule 13d-3 under the Exchange Act, Stephen Feinberg is deemed to beneficially own approximately 12,371,859 shares of [Anchor] common stock and approximately 72,656 shares of [Anchor] series C participating preferred stock." (¶ 50).

Feinberg.  Defendants have moved to dismiss all of the claims.

### III.  Anchor Defendants' Motion to Dismiss[11]

The Anchor Defendants move to dismiss all four claims.  Accordingly, the Court will

address each argument.[12]

### A.  Section 10(b)[13] and Rule 10b-5[14] Claim

---

[11]The Anchor Defendants consist of Campbell, Deneau, Reno, Asen, Chapman, Gallen, Hamilton, Price, Schumacher, and Tessler.

[12]The Court notes that "when considering a motion to dismiss in a securities fraud case, [a court] may take judicial notice (for the purpose of determining what statements the documents contain and not to prove the truth of the documents' contents) of relevant public documents required to be filed with the SEC, and actually filed." Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1278 (11th Cir. 1999).

[13]Section 10(b) provides:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . .[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
15 U.S.C. § 78j.

[14]Rule 10b-5 provides:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
17 C.F.R. § 240.10b-5.

In order to state a claim under § 10(b) and Rule 10b-5, a plaintiff must show the following: "'(1) a misstatement or omission, (2) of a material fact, (3) made with scienter, (4) on which plaintiff relied, (5) that proximately caused his injury.'" Ziemba v. Cascade International, Inc., 256 F.3d 1194, 1202 (11th Cir. 2001)(quoting Bryant, 187 F.3d at 1281). At the hearing, Plaintiffs stated that the misstatements and omissions on which their Section 10(b) and Rule 10b-5 Claim is based are: (1) the asset impairment misstatement (i.e., the failure to write down the assets of the Connellsville plant prior to the closing of the plant), and (2) the cash flow misstatements.

The Anchor Defendants argue that Plaintiffs' Section 10(b) and Rule 10b-5 Claim should be dismissed. For the reasons stated below, the Court grants Defendants' motion on this issue in part.

### 1. Cash Flow Misstatements

Plaintiffs' Section 10(b) and Rule 10b-5 Claim is based in part on the cash flow misstatements. Plaintiffs contend that Anchor misstated its cash flows from operations in the financial statements included in the prospectus and in the cash flow statements for the periods ending September 30, 2003, December 31, 2003, June 30, 2004, and September 30, 2004. These misstatements were made in connection with payments Anchor made under a settlement agreement with the Pension Benefit Guaranty Corporation ("PBGC"), which Anchor classified as cash flows from financing activities. (Doc. No. 63, Ex. B, p. 43). The PBGC payments were later reclassified as cash flows from operating activities.

Defendants argue that to the extent that Plaintiffs' Section 10(b) and Rule 10b-5 Claim is

14

based on the cash flow misstatements, the claim should be dismissed because: (1) Plaintiffs have

failed to sufficiently allege scienter, and (2) Plaintiffs Bellefeuille and Steamfitters  Local 449

Pension and Retirement Security Funds ("Steamfitters") have failed to sufficiently allege that

their losses were caused by the cash flow misstatements.  The Court agrees with Defendants'

arguments on these issues.

### a. Scienter

The Private Securities Litigation Reform Act ("PSLRA") provides that with respect to

each alleged misrepresentation, the plaintiff must state with particularity facts giving rise to a

strong inference that the defendant acted with the required state of mind.  See 15 U.S.C. § 78u-

4(b)(2).  The "required state of mind" set forth in § 78u-4(b)(2) refers to the scienter requirement,

and the Supreme Court has defined scienter in Section 10(b) and Rule 10b-5 claims to mean "a

'mental state embracing intent to deceive, manipulate, or defraud.'" Bryant, 187 F.3d at 1281-82

(quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 n.12 (1976)).

Scienter can be alleged by pleading facts that denote severe recklessness.  See Bryant, 187

F.3d at 1283.  "'Severe recklessness is limited to those highly unreasonable omissions or

misrepresentations that involve not merely simple or even inexcusable negligence, but an

extreme departure from the standards of ordinary care, and that present a danger of misleading

buyers or sellers which is either known to the defendant or is so obvious that the defendant must

have been aware of it.'" In re Smith Gardner, Securities Litigation, 214 F. Supp.2d 1291, 1298

(S.D. Fla. 2002)(quoting Broad v. Rockwell International Corp., 642 F.2d 929, 961-62 (5th Cir.

1981)).

The Anchor Defendants argue that the alleged cash flow misstatements resulted from

Anchor reclassifying payments under the PBGC settlement agreement from cash outflows from financing activities to cash outflows from operations. These defendants point out that in the prospectus, Anchor states that its cash flows from financing activities include payments under the PBGC settlement agreement. (Doc. No. 63, Ex. B, p. 43). As such, these defendants argue that Plaintiffs have failed to adequately allege scienter, since the prospectus shows that Anchor clearly disclosed the existence and purported characterization of the PBGC payments to investors. Therefore, these defendants argue that the prospectus shows that Anchor merely mischaracterized the PBGC payments as cash outflows from financing activities rather than cash outflows from operations, but given its disclosures, it is obvious that the mischaracterization was not done with scienter.

Upon review of the allegations in the complaint, the Court finds Plaintiffs have not alleged an intent to defraud or severe recklessness relating to the cash flow misstatements. As such, the Court finds that to the extent that Plaintiffs' Section 10(b) and Rule 10b-5 Claim is based on the cash flow misstatements, the claim is dismissed.

### b. Loss Causation

Furthermore, the Court notes that even if Plaintiffs had adequately alleged scienter, the Court would dismiss Plaintiffs Bellefeuille and Steamfitters' Section 10(b) and Rule 10b-5 Claim to the extent it is based on cash flow misstatements, since they have failed to adequately plead loss causation.

Pursuant to the PSLRA, Plaintiffs have the burden of proving that each alleged misrepresentation or omission caused the loss for which Plaintiffs seek to recover damages. See 15 U.S.C. § 78u-4(b)(4). The Supreme Court addressed the loss causation requirement in

16

Dura Pharmaceuticals, Inc. v. Broudo, 125 S. Ct. 1627 (2005).

In Dura, the Supreme Court stated that a plaintiff must "prove that the defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss." Id. at 1634. In discussing the pleading requirements for loss causation, the Court stated that "it should not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." Id.

In Dura, the plaintiffs bought stock in a pharmaceuticals company. See id. at 1629. The plaintiffs alleged that during the purchase period, the company made false statements that the FDA would soon approve a new asthmatic spray device. See id. at 1630. The company later announced that the FDA would not approve its new asthmatic spray device. See id. The day after this announcement, the company's stock price temporarily fell, but it almost fully recovered within one week. See id. The plaintiffs alleged that they paid artificially inflated prices for the company's stock based on the misrepresentation that the FDA would approve the asthmatic spray device, which caused them to suffer damages. See id.

The Dura Court found the plaintiffs' loss causation allegations to be insufficient, since the plaintiffs were relying on purchase price inflation to show that the alleged misrepresentations caused their loss rather than showing a causal connection between the alleged misrepresentation and their loss. See id. at 1634. The Court noted that the plaintiffs did not claim that the stock price fell significantly after the truth about the asthmatic spray device was revealed, which suggested that the plaintiffs were relying on purchase price inflation to show loss causation. See id. As such, the Court concluded that the plaintiffs' complaint was legally insufficient for failing

17

to adequately allege loss causation.  See id.

The Eleventh Circuit has also discussed the loss causation requirement.  In Robbins v.

Koger Properties, Inc., 116 F.3d 1441 (11ᵗʰ Cir. 1997), the court stated:

> To prove loss causation, a plaintiff must show that the untruth was in some
> reasonably direct, or proximate, way responsible for his loss.  If the investment
> decision is induced by misstatements or omissions that are material and that were
> relied on by the claimant, but are not the proximate reason for his pecuniary loss,
> recovery . . . is not permitted.  In other words, loss causation describes the link
> between the defendant's misconduct and the plaintiff's economic loss.  Because
> market responses, such as stock downturns, are often the result of many different,
> complex, and often unknowable factors, the plaintiff need not show that the
> defendant's act was the sole and exclusive cause of the injury he has suffered; he
> need only show that it was "substantial," i.e., a significant contributing cause.

Id. at 1447 (internal quotations and citations omitted).

In the instant case, the Anchor Defendants argue that Bellefeuille and Steamfitters have

failed to allege loss causation relating to the cash flows misstatements, since the improper

classification of PBGC payments was not revealed until March 29, 2005.  (Doc. No. 28, ¶ 55).

Bellefeuille sold all of his Anchor stock by October 22, 2004, and Steamfitters sold all of its

stock by September 24, 2004.  (Doc. No. 63, Ex. F).  Since these plaintiffs sold all of their stock

before the corrective disclosure was made, these plaintiffs have failed to adequately allege that

their losses resulted from the cash flow misstatements.[15]  See Dura, 125 S. Ct. at 1631 (stating

that if the purchaser sells his stock before the relevant truth begins to leak out, the

misrepresentation will not have caused his loss).  Accordingly, to the extent that Bellefeuille and

Steamfitters' Section 10(b) and Rule 10b-5 Claim is based on cash flow misstatements, their

claim is dismissed for failing to plead loss causation.

_____

[15]Furthermore, the Court notes that the "Loss Causation" section of the complaint
contains allegations solely related to the Connellsville plant.  (Doc. No. 28, ¶ 158-60).

### 2. Connellsville Plant

The Anchor Defendants argue that Plaintiffs' Section 10(b) and Rule 10b-5 Claim based on the failure to write down the assets of the Connellsville plant prior to its closing should be dismissed. Specifically, these defendants argue that: (1) Plaintiffs have not alleged with sufficient particularity an actionable misstatement or omission; (2) Plaintiffs have failed to adequately plead that Campbell, Deneau, and Reno acted with scienter; and (3) Plaintiffs have failed to adequately plead that the alleged misstatement caused Bellefeuille and Steamfitters' losses. Accordingly, the Court will address each argument.

### a. Particularity and Actionable Statement/Omission

Plaintiffs contend that in violation of GAAP, specifically Statement of Financial Accounting Standards No. 144 ("SFAS 144"), Anchor improperly delayed the recognition of the impairment in the values of certain inventory, property, and equipment of the Connellsville plant until it closed the plant in November of 2004. SFAS 144 requires recognition of an impairment loss if the carrying amount of a long-lived asset is not recoverable from its undiscounted future cash flows.

The Anchor Defendants make several arguments in support of their contention that dismissal is warranted because the alleged misstatement regarding the Connellsville plant is neither misleading nor stated with sufficient particularity. For the reasons stated below, the Court rejects these arguments.

### i. Testing for Impairment

The Anchor Defendants argue that Plaintiffs' allegation that Anchor did not test its plant and equipment assets for impairment when it lost the Rolling Rock contract is unsupported, since

19

the prospectus discloses that Anchor concluded that no impairment existed as of December 31, 2002. Therefore, these defendants argue that since Plaintiffs do not allege that this assessment of impairment as of December 31, 2002 failed to consider the impact of the lost Rolling Rock contract, their allegation cannot stand. The Court, however, rejects this argument, because whether Anchor actually and properly evaluated its plant and equipment assets for impairment when it lost the Rolling Rock contract is a question of fact, despite the fact that Anchor stated in its prospectus that it concluded that no impairment existed as of December 31, 2002.

### ii.  Bespeaks Caution Doctrine

Next, the Anchor Defendants argue that the determination of whether the Connellsville assets were impaired after the loss of the Rolling Rock contract required Anchor to make certain assumptions and predictions of future events. Therefore, these defendants argue that the determination that there was no impairment of assets prior to the closure of the Connellsville plant constitutes a projection or opinion protected by the "bespeaks caution" doctrine.

In the case of In re Donald J. Trump Casino Securities Litigation–Taj Mahal Litigation, 7 F.3d 357 (3d Cir. 1993), the court discussed the "bespeaks caution" doctrine.[16] The In re Trump court stated that according to the bespeaks caution doctrine, "a court may determine that the inclusion of sufficient cautionary statements in a prospectus renders misrepresentations and omissions contained therein nonactionable." Id. at 364. The court further stated that the bespeaks caution doctrine "is essentially shorthand for the well-established principle that a statement or omission must be considered in context, so that accompanying statements may render it

---

[16]The Eleventh Circuit approved of the explanation of the "bespeaks caution" doctrine contained in In re Trump. See Saltzberg v. TM Sterling/Austin Associates, Ltd., 45 F.3d 399, 400 (11th Cir. 1995).

immaterial as a matter of law." Id.

The In re Trump court noted that opinions, predictions, projections, estimates, forecasts, and other forward-looking statements are not *per se* inactionable under the securities laws. See id. at 368, 369 n.11. The court stated that such statements may be actionable misrepresentations if the speaker does not genuinely and reasonably believe them. See id. at 368.

The In re Trump court stated that "[t]he application of bespeaks caution depends on the specific text of the offering document or other communication at issue. i.e., courts must assess the communication on a case-by-case basis." Id. at 371 (citation omitted). However, the court stated that in general, "when an offering document's forecasts, opinions or projections are accompanied by meaningful cautionary statements, the forward-looking statements will not form the basis for a securities fraud claim if those statements did not affect the 'total mix' of information the document provided investors. In other words, cautionary language, if sufficient, renders the alleged omissions or misrepresentations immaterial as a matter of law." Id. The court noted that "a vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation. To suffice, the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions in the prospectus which the plaintiffs challenge." Id. at 371-72.

In the In re Trump case, the plaintiffs were investors who purchased bonds to provide financing for the acquisition and completion of a lavish casino/hotel. See id. at 364. The plaintiffs' complaint focused on a statement in the prospectus that the company believed that funds generated by the operation of the casino/hotel would be sufficient to cover all of its debt service (interest and principal). See id. at 365.

The defendants moved to dismiss the complaint, arguing that since the prospectus contained abundant warnings and cautionary statements, the plaintiffs could not contend that they were misled by the alleged misrepresentation.  See id. at 367.  The prospectus pointed out that the casino/hotel was a new venture of unprecedented size and scale, that the casino business had a seasonal nature, and that the casino/hotel at issue had no operating history, and thus, no history of earnings.  See id. at 370.  Therefore, the prospectus pointed out that these factors could adversely affect the company's ability to pay interest on the bonds.  See id.  Furthermore, the prospectus stated that no assurance could be given that the casino/hotel would be profitable or that it would generate cash flow sufficient to provide for the payment of the debt service.  See id.

The In re Trump court stated:

> [W]e must consider an alleged misrepresentation within the context in which the speaker communicated it.  Here the context clearly and precisely relayed to the bondholders the substantial uncertainties inherent in the completion and operation of the [casino/hotel].  The prospectus contained both general warnings that the [company] could not assure the repayment of the bonds as well as specific discussions detailing a variety of risk factors that rendered the completion and profitable operation of the [casino/hotel] highly uncertain.  Within this broad context the statement at issue was, at worst, harmless.

Id. at 371.  The court further stated:

> Because of the abundant and meaningful cautionary language contained in the prospectus, we hold that the plaintiffs have failed to state an actionable claim regarding the statement that the [company] believed it could repay the bonds.  We can say that the prospectus here truly bespeaks caution because, not only does the prospectus generally convey the riskiness of the investment, but its warnings and cautionary language directly address the substance of the statement the plaintiffs challenge.  That is to say, the cautionary statements were tailored precisely to address the uncertainty concerning the [company's] prospective ability to repay the bondholders.

Id. at 372.

22

In the instant case, the Anchor Defendants argue that the bespeaks caution doctrine applies, because (1) whether an asset is impaired necessarily requires a projection or forecast of the future economic performance of the asset, and (2) the alleged misstatement was accompanied by meaningful cautionary language.  Specifically, these defendants point out that the prospectus states:

> We make **estimates** regarding the useful lives of [property, plant, and equipment] and any changes in the actual lives could result in material changes in the net book value of those assets.  We evaluate the recoverability of our long-lived assets whenever adverse events or changes in business climate indicate that the **expected** undiscounted **future** cash flows from the related asset may be less than previously **anticipated**.  If the net book value of the related asset exceeds the undiscounted future cash flows of the asset, the carrying amount would be reduced to the present value of its **expected future cash flows** and an impairment loss would be recognized.  **This analysis requires us to make significant estimates and assumptions, and changes in facts and circumstances could result in material changes in the carrying value of the assets.**

(Doc. No. 63, Ex. B. p. 46)(emphasis added).

Plaintiffs respond that the bespeaks caution doctrine does not apply, because (1) the misstatement at issue (i.e., the alleged asset impairment) is not a projection or forecast, because it relates to whether the assets were impaired at the time that the statements were issued,[17] and (2) there was not meaningful cautionary language sufficient to neutralize the misrepresentation.  The Court finds Plaintiffs' arguments persuasive on this issue.  Defendants have failed to cite a case that holds that the determination of whether an asset is impaired is a projection or forecast that comes within the bespeaks caution doctrine.

Furthermore, the language that these defendants point to as "meaningful cautionary

---

[17]Anchor lost the Rolling Rock contract in August of 2002 and the prospectus was issued on September 9, 2003.

language" is merely general, boilerplate language that conveys that the analysis undertaken to determine whether any assets were impaired was based on estimates and assumptions and that changes in facts and circumstances could affect the accuracy of the valuations of the assets. Anchor does not identify any factors specific to Anchor that could affect the accuracy of its analysis. Instead, it generally identifies factors that affect all asset impairment analyses by stating that changes in the actual lives of the assets and adverse events and changes in business climates could affect the accuracy of its analysis. Such general statements do not constitute meaningful cautionary language in this case.

The Eleventh Circuit has discussed what constitutes meaningful cautionary language in Harris v. Ivax Corp., 182 F.3d 799 (11th Cir. 1999). Specifically, the Harris court stated that meaningful cautionary language will mention important factors that could cause actual results to differ materially from those in the forward-looking statement, but a listing of all factors is not required. See id. at 807. As such, the Harris court stated that "when an investor has been warned of risks of a significance similar to that actually realized, she is sufficiently on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward." Id.

In the instant case, the language at issue does not identify important factors that could affect the analysis that was allegedly undertaken to determine if the assets were impaired. As such, the Court rejects the Anchor Defendants' argument that the bespeaks caution doctrine applies in this case.

24

### iii.  Predictions Versus Statements of Fact

Next, the Anchor Defendants argue that since the determination of whether the

Connellsville assets were impaired after the loss of the Rolling Rock contract required Anchor to

make certain assumptions and predictions of future events, the determination that there was no

impairment of assets prior to the closure of the Connellsville plant cannot constitute a statement

of fact that was false when made. The Court rejects this argument because, even assuming that

the alleged misstatement consisted of a prediction that did not come true, predictions and other

forward looking statements "may be actionable misrepresentations if the speaker does not

genuinely and reasonably believe them."  See In re Trump, 7 F.3d at 368 (citations omitted).

Furthermore, Plaintiffs have alleged that it was not reasonable for Anchor to believe that the

assets of the Connellsville plant were not impaired prior to the closing of the plant.

The Court notes that the Anchor Defendants argued at the hearing that there could be no

asset impairment until Anchor decided to close the Connellsville plant.  This Court rejects this

argument, as it is based on the contention that an asset cannot be impaired until the company

stops using it.  If an impairment could only exist once a company stopped using the asset, the

calculation set forth in SFAS 144 would be meaningless.  Instead, SFAS 144 requires a company

to analyze the future cash flows from the asset and compare it to the asset's carrying value, which

indicates that an impairment can occur while the asset is still being used by the company.

Anchor's statement in its prospectus about its SFAS 144 analysis (that it evaluates the value of

its long-lived assets *whenever adverse events or changes in business climate* indicate that the

expected undiscounted future cash flows from the related asset may be less than previously

anticipated) supports the conclusion that an impairment can occur while the company continues

25

using the asset.

### iv.  Confidential Sources

Next, the Anchor Defendants argue that Plaintiffs' reliance on confidential sources to

provide a basis for their allegations regarding asset impairment makes the complaint subject to

dismissal.  Specifically, these defendants argue that the confidential witnesses' statements do not

show that the assets at the Connellsville plant were impaired.  The Court, however, rejects this

argument, because the statements made by the confidential sources support Plaintiffs' theory that

the assets were impaired prior to the closing of the plant.

The confidential witnesses state that: (1) after Anchor lost the Rolling Rock contract in

2002, the operations at the Connellsville plant declined precipitously;[18] (2) when the contract

with Rolling Rock was not renewed in 2002, the Connellsville plant had no prospect of returning

to its previous level of profitability, because the Rolling Rock contract occupied two of the

plant's four glass making shops on a full-time basis during the term of the contract, and there

were no potential customers in proximity to the Connellsville facility that could generate

comparable volume requirements; [19] (3) the Rolling Rock contract required the use of decorating

equipment to paint the Rolling Rock bottles, and there were virtually no customers other than

Rolling Rock that required labels to be painted onto their bottles; as a result, when Rolling Rock

---

[18]This statement was made by "W-1," a former Anchor Director of Financial Planning and Analysis, who was employed with Anchor for 23 years and who left in February 2004.  (Doc. No. 28, ¶ 69).

[19]This statement was made by "W-2," an Anchor Connellsville Plant Controller who worked at the plant for 4 years until December 2004.  (Doc. No. 28, ¶ 71).  As Plant Controller, this witness analyzed expenses and maintained physical inventory of stored and finished goods. (Doc. No. 28, ¶ 75).

cancelled its contract, the decorating equipment became idle and was no longer utilized, but the value of the decorating equipment was not written down;[20] (4) the four decorating machines and two decorating "lehrs" of the Connellsville plant were rarely used after the Rolling Rock contract was lost;[21] (5) the Connellsville plant had no other customers for the decorating equipment used to service the Rolling Rock account;[22] (6) after the loss of the Rolling Rock contract, there were virtually no customers who wanted printed labels;[23] (7) the loss of Yuengling Beer and Rolling Rock marked the elimination of Connellsville's entire customer base, that is, the loss of all accounts that were unique and proximate to Connellsville;[24] and (8) the decorating department at the Connellsville plant was shut down in March of 2003 when Anchor printed the last Rolling Rock bottle.[25]

Additionally, the Anchor Defendants argue that the confidential witness statements should not be considered, because there are no allegations to support an inference that based on their positions and job duties, they had a reliable basis for their statements. The Court rejects this argument. Confidential witnesses "may be used to sustain complaints under the PSLRA so long

---

[20]This statement was made by W-2.  (Doc. No. 28, ¶ 75).

[21]This statement was made by "W-3," a group leader who worked at the Connellsville plant for 39 over years and up to the closing of the Connellsville plant. (Doc. No. 28, ¶ 75).

[22]This statement was made by "W-4," Anchor's Corporate Controller from Spring 2001 to April 2003 based at Anchor's Tampa headquarters.  (Doc. No. 28, ¶ 75).

[23]This statement was made by W-2.  (Doc. No. 28, ¶ 75).

[24]This statement was made by "W-6," a Quality Inspector who worked at the Connellsville Plant for 31 years and two summers and until it closed.  (Doc. No. 28, ¶ 75).

[25]This statement was made by W-6.  (Doc. No. 28, ¶ 75).

as the sources are described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." Marrari v. Medical Staffing Network Holdings, Inc., 395 F. Supp.2d 1169, 1188 (S.D. Fla. 2005)(citations omitted). The Court finds that Plaintiffs have satisfied this requirement.

### v. Particularity

Next, the Anchor Defendants argue that Plaintiffs' allegations are not made with sufficient particularity.  In order to survive a motion to dismiss, Plaintiffs' claim of fraud under § 10(b) and Rule 10b-5 must satisfy the requirements of Federal Rule of Civil Procedure 9(b), which requires that allegations of fraud be stated with particularity.  See Ziemba, 256 F.3d at 1202.  However, the application of Rule 9(b) must not abrogate the concept of notice pleading. See id.  Instead, "Rule 9(b) is satisfied if the complaint sets forth '(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.'" Id. (quoting Brooks v. Blue Cross & Blue Shield of Fla., Inc., 116 F.3d 1364, 1371 (11th Cir. 1997)).

Additionally, the PSLRA "mandates that allegations of fraud brought under that statute must meet a heightened pleading requirement." In re Noven Pharmaceuticals, Inc., 238 F. Supp.2d 1315, 1319 (S.D. Fla. 2002)(citing 15 U.S.C. § 78u-4(b)).  Specifically, the PSLRA provides that "the complaint shall specify each statement alleged to have been misleading, the

reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Furthermore, the PSLRA provides that dismissal is required if the complaint does not meet the PSLRA's heightened pleading requirements. 15 U.S.C. § 78u-4(b)(4).

The Anchor Defendants argue that Plaintiffs do not identify precisely what statements were misleading and why such statements were misleading. Specifically, these defendants point out that Plaintiffs do not allege when Connellsville's assets should have been written down, which assets should have been written down, and by how much. These defendants rely on In re Midway Games, Inc. Securities Litigation, 332 F. Supp.2d 1152 (N.D. Ill. 2004), and In re K-tel International, Inc. Securities Litigation, 300 F.3d 881 (8th Cir. 2002), to support their argument.

Plaintiffs respond that their allegations are sufficient, because with respect to the prospectus, (1) they have identified the misstatement: the value of Anchor's plant, equipment, and inventory for the four months ending December 31, 2002 and six months ending June 30, 2003; (2) they have identified who made the misstatement: the Anchor executives; (3) they have identified when the misstatement was made: September 25, 2003; (4) they have identified the basis for the allegation that the assets were impaired: the loss of the Rolling Rock contract in 2002; and (5) they have identified the amount of the impairment and the basis for the amount: $25 million for the property and equipment and $4-10 million for inventory, as these were the amounts of the write-downs that were later taken.

The Court finds Plaintiffs' argument persuasive and finds that Plaintiffs have sufficiently

alleged facts suggesting that the need to write-down the assets of the Connellsville plant was so apparent to the defendants prior to the closing of the plant that the failure to take earlier write-downs amounted to fraud.  The Court finds that <u>Carpenters Health & Welfare Fund v. The Coca-Cola Co.</u>, 321 F. Supp.2d 1342 (N.D. Ga. 2004), is instructive.  In <u>Carpenters</u>, the court found that the plaintiffs' section 10(b) claim was stated was sufficient particularity.  The plaintiffs in <u>Carpenters</u> alleged that the defendants failed to timely write down certain impaired foreign bottling and vending assets.  <u>See</u> <u>id.</u> at 1344.

In the fourth quarter of 1999, Coke recorded a charge of approximately $543 million to reflect the impairment of certain assets in Russia and the Caribbean.  <u>See</u> <u>id.</u> at 1352.  In the first quarter of 2000, Coke recorded a $405 million charge to reflect the write-down in carrying value of the company's bottling operations in India.  <u>See</u> <u>id.</u>  The plaintiffs alleged that based on the negative economic environment, an impairment review of Coke's assets in Russia and India during the third quarter of 1999 and the fourth quarter of 1999, respectively, would have required Coke to record these charges a quarter earlier.  <u>See</u> <u>id.</u>  The plaintiffs alleged that an impairment analysis would have shown that Coke's Russian assets were impaired by September 30, 1999, based on the following factors: the worsening of Russia's economic crisis in 1998; charges recorded by competitors Pepsi and Cadbury Schweppes in the fourth quarter of 1998; a 60 percent decrease in Coke's sales in Russia between August 1998 and September 30, 1999, coupled with a four-fold increase in the cost of production; Coke's abandonment of two large bottling facilities in Russia prior to the end of the third quarter of 1999; a 50 percent decline in the value of Russian bottling assets by October 1998; and lay-offs of Coke's staff in Russia.  <u>See</u> <u>id.</u> at 1352 n.5.  The plaintiffs identified the following factors existing as of December 31, 1999

with respect to India: continued poor performance in the Indian territories; a shake-up in Coca-Cola India management; idle bottling plants; and lay-offs of Coke's staff in India. See id. at 1352 n5.

The defendants argued that the asset impairment allegations were insufficiently particular because the plaintiffs failed to allege any facts that called into question the impairment review conducted by Coke pursuant to SFAS 121.[26] See id. at 1352. The plaintiffs responded that they were not required to allege details of SFAS 121 calculations because other allegations established the need for the write-downs. See id.

The court concluded that the plaintiffs had pled their asset impairment claims with sufficient particularity. See id. The court noted that the plaintiffs' allegations made clear that the need to write-down was so apparent to the defendants that a failure to take earlier write-downs amounted to fraud. See id. The court pointed out that the plaintiffs did not merely "'seize[] figures used in subsequent financial statements to show that the information should have been disclosed earlier.'" Id. (quoting K-tel Int'l Inc. Sec. Lit., 107 F. Supp.2d 994, 1000 (D. Minn. 2000)).

Likewise, in the instant case, Plaintiffs have sufficiently alleged facts suggesting that the need to write-down the assets of the Connellsville plant was so apparent to the defendants prior to the closing of the plant that the failure to take earlier write-downs amounted to fraud. Furthermore, Plaintiffs did not merely seize figures used in subsequent financial statements to show that the write-downs should have been taken earlier. Instead, they alleged that (1) Anchor

---

[26]SFAS 144 superseded SFAS No. 121.

lost the Rolling Rock contract on August 8, 2002; (2) the Rolling Rock contract accounted for 50% of the Connellsville plant's production and sales; (3) due to the significant cost of transportation, most of Anchor's customers are located within a 150-mile radius of a plant; (4) after Anchor lost the Rolling Rock contract in 2002, the operations at the Connellsville facility declined precipitously; (5) the Rolling Rock contract required the use of decorating equipment to paint the Rolling Rock bottles, and when Rolling Rock cancelled its contract, the decorating equipment became idle and was no longer utilized as of March 2003; (6) by early 2003, the Connellsville plant lost Yuengling Beer as a customer, which marked the elimination of the entire customer base that was unique and proximate to Connellsville; and (7) by the time of the Offering, more than a year had passed since Anchor found out that it had lost the Rolling Rock contract and Anchor had not yet found replacement customers to make up for the loss of the Rolling Rock contract. As such, the Court rejects the Anchor Defendants' argument on this issue.

### b. Scienter

Next, the Anchor Defendants argue that Plaintiffs' Section 10(b) and Rule 10b-5 Claim should be dismissed, because Plaintiffs have failed to adequately plead scienter. As previously stated, the PSLRA provides that with respect to each alleged misrepresentation, the plaintiff must state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind. See 15 U.S.C. § 78u-4(b)(2).

Scienter can be alleged by pleading facts that denote severe recklessness. See Bryant, 187 F.3d at 1283. "'Severe recklessness is limited to those highly unreasonable omissions or

misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.'" In re Smith Gardner, 214 F. Supp.2d at 1298(quoting Broad, 642 F.2d at 961-62).

Scienter cannot be alleged by simply pleading motive and opportunity.  See Bryant, 187 F.3d at 1285.  The Eleventh Circuit has stated:

> While allegations of motive and opportunity may be relevant to a showing of severe recklessness, we hold that such allegations, without more, are not sufficient to demonstrate the requisite scienter in our Circuit. We quantify scienter as encompassing at least a showing of severe recklessness, and although motive and opportunity to commit fraud may under some circumstances contribute to an inference of severe recklessness, we decline to conclude that they, standing alone, are its equivalent.

Id. at 1285-86.

Plaintiffs' Section 10(b) and Rule 10b-5 Claim is asserted against Deneau, Campbell, and Reno, and as such, Plaintiffs must allege with particularity facts giving rise to a strong inference that these defendants acted with at least severe recklessness.  These defendants argue that Plaintiffs have failed to do so.

Specifically, these defendants argue that Plaintiffs have failed to allege that these defendants knew or recklessly disregarded that the assets of the Connellsville plant were impaired.  These defendants cite Stavros v. Exelon Corp., 266 F. Supp.2d 833 (N.D. Ill. 2003), to support their argument.

In Stavros, the plaintiffs filed a section 10(b) claim against the defendants for falsely

33

representing that the company's financial statements were prepared in accordance with GAAP when the company failed to timely record an impairment in the value of its investment in Corvis. See id. at 840. The defendants moved to dismiss, arguing that the plaintiffs failed to adequately allege scienter, and the court agreed with the defendants. See id. at 850.

The Stavros court stated that "allegations of GAAP violations, standing alone, are insufficient to raise an inference of scienter." Id. (citation omitted). The court stated that instead, "a plaintiff must also plead facts that support an inference that a defendant acted with reckless disregard or gross indifference to alleged misrepresentations in financial statements." Id. Furthermore, the court stated that "[f]acts that might support such an inference include those detailing the magnitude of the accounting error, a defendant's prior notice of the error or a defendant's responsibility for calculating and disseminating financial information." Id.

The court noted that the company wrote down the investment in Corvis in the third quarter of 2001, and the plaintiffs contended that the impairment should have been recorded in the first or second quarter of 2001. See id. at 851. As such, the court stated that since the defendants did write down the investment in Corvis in the third quarter, the parties only disputed when the write down should have occurred. See id. The court concluded that the plaintiffs' allegations did not raise a strong inference of scienter, stating:

> Despite the falling price of Corvis shares during the first half of 2001, Defendants did not write down their investment in Corvis during the first two quarters, holding out for a rebound in the share price. Perhaps the delay in reporting the write down was overly-optimistic, but . . . for every write-down, there is always someone who says the company should have acted sooner. In this case, Plaintiffs only assert that the company should have reported the impairment three to six months before it actually did so.

Id. at 851-52.

Likewise, the court in <u>DiLeo v. Ernst & Young</u>, 901 F.2d 624, 627 (7th Cir. 1990), also found that allegations that the company failed to recognize a decrease in value sooner did not sufficiently allege fraud.  In <u>DiLeo</u>, the plaintiffs alleged that the company, a bank, failed to increase its reserves for uncollectable loans fast enough.  <u>See id.</u> at 626.  The appellate court affirmed the dismissal of the case, stating:

> For any bad loan the time comes when the debtor's failure is so plain that the loan is written down or written off.  No matter when a bank does this, someone may say that it should have acted sooner.  If all that is involved is a dispute about the timing of the writeoff, based on estimates of the probability that a particular debtor will pay, we do not have fraud; we may not even have negligence. Recklessness or fraud in making loans is not the same as fraud in discovering and revealing that the portfolio has turned sour.

<u>Id.</u> at 627.

The court noted that it could not tell from reading the plaintiffs' complaint why they believed that the problems were so apparent that the reserves should have been increased sooner, and as such, the plaintiffs failed to show why the failure to increase the reserves amounted to fraud.  <u>See id.</u> The court stated:

> The story in this complaint is familiar in securities litigation.  At one time the firm bathes itself in a favorable light.  Later the firm discloses that things are less rosy. The plaintiff contends that the difference must be attributable to fraud.  "Must be" is the critical phrase, for the complaint offers no information other than the differences between the two statements of the firm's condition.  Because only a fraction of financial deteriorations reflects fraud, plaintiffs may not proffer the different financial statements and rest.  Investors must point to some facts suggesting that the difference is attributable to fraud. . . . That ingredient is missing in [the plaintiffs'] complaint.

<u>Id.</u> at 627-28 (citations omitted).

The Court finds that <u>Stavros</u> and <u>DiLeo</u> are distinguishable, since Plaintiffs have pointed

to facts suggesting that the failure to write down the assets sooner was attributable to fraud. Plaintiffs argue that they have sufficiently alleged that these defendants knew or recklessly disregarded that the assets of the Connellsville plant were impaired by alleging that: (1) Deneau, Reno, and Campbell were all high ranking officers of Anchor, and their positions within the company support an inference that they had knowledge of facts important to the company; (2) Deneau and Campbell knew that the Rolling Rock contract provided 50% of the revenues for the Connellsville plant; (3) Deneau, Reno, and Campbell knew or recklessly disregarded the fact that Connellsville had no replacement prospect for the lost Rolling Rock contract for a customer close enough to the Connellsville plant to make the transportation costs cheap enough to make the contract profitable; (4) Deneau, Reno, and Campbell had access to Anchor's computer system on which the Connellsville plant costs and expenses were readily available; and (5) Deneau and Campbell sold nearly 30% of their Anchor stock on the same day, and as such, their sales were suspicious in timing and amount. The Court finds that these allegations are sufficient to plead scienter.

The Court notes that Defendants argue that the Court should not consider Deneau and Campbell's sale of their Anchor stock, since there is no trading history to compare their sales with since they could not previously sell their stock due to a lock-up agreement.[27] (Doc. No. 63, Ex. B. p. 77). Defendants cite Ronconi v. Larkin, 253 F.3d 423, 436 (9th Cir. 2001), and In re Vantive Corp. Securities Litigation, 283 F.3d 1079, 1095 (9th Cir. 2002), to support their

---

[27]The lock-up agreement kept them from selling their shares for 180 days after the date of the prospectus (September 24, 2003). (Doc. No. 63, Ex. B, p. 77). As such, the lock-up agreement expired on March 23, 2004.

contention that if the plaintiff does not allege a sufficient trading history for the defendant, the court cannot conclude that the defendant's trading was suspicious. However, when determining whether Deneau and Campbell's stock sales are suspicious, the Court considers the following factors (1) the amount and percentage of shares sold; (2) the timing of the sales; and (3) whether the sales were consistent with their prior trading history. See Ronconi. 253 F.3d at 435 (citation omitted).

Deneau and Campbell sold nearly 30% of their Anchor stock on the same day. Furthermore, they sold their stock just seven days after holding a conference call with analysts and presenting very strong positive news about Anchor. Even though there is no trading history to compare these sales to, these stock sales appear somewhat suspicious in timing and amount. However, even if the Court were to disregard these stock sales, the Court finds that Plaintiffs have adequately pled scienter.

Specifically, Plaintiffs allege that these defendants knew that Anchor lost the Rolling Rock contract and that a replacement customer would need to be located in close proximity in order to be profitable. If, as alleged by Plaintiffs, a replacement customer needed to be located within 150 miles of the Connellsville plant, then the replacement possibilities were likely limited. and given that the loss of the Rolling Rock contract occurred more than a year before the Offering, Plaintiffs have adequately alleged facts suggesting that these defendants knew by the time of the Offering that it was likely that Anchor would not find a replacement customer, and as a result. the assets of the Connellsville plant were impaired.

Additionally, Plaintiffs have alleged that these defendants had the motive and opportunity

to commit fraud, which Plaintiffs argue further shows scienter.  Specifically, Plaintiffs contend

that Deneau, Reno, and Campbell were motivated to hide the adverse information regarding the

Connellsville plant, because (1) if Anchor had taken a write-down before the Offering, it would

have either delayed the Offering or resulted in a lower offering price; and (2) it was necessary to

hide the asset impairment in order to successfully complete Anchor's $51.2 million sale of 11%

Series B Senior Secured Notes for which the security was substantially all of Anchor's property,

plant, and equipment relating to its nine operating plants.  Accordingly, the Court rejects

Defendants' argument that Plaintiffs have not adequately pled scienter relating to the asset

impairment misstatement.

### c.  Loss Causation

Next, the Anchor Defendants argue that Bellefeuille and Steamfitters' Section 10(b) and

Rule 10b-5 Claim based on the failure to write-down the assets of the Connellsville plant should

be dismissed, because they have failed to allege loss causation.  As previously stated, pursuant to

the PSLRA, Plaintiffs have the burden of proving that each alleged misrepresentation or

omission caused the loss for which Plaintiffs seek to recover damages.  See 15 U.S.C. § 78u-

4(b)(4).

The Anchor Defendants argue that Bellefeuille and Steamfitters cannot allege loss

causation relating to the failure to write down the assets of the Connellsville plant, since they

sold their Anchor stock prior to the November 2004 corrective disclosures.  Bellefeuille sold all

of his stock by October 22, 2004, and Steamfitters sold all of its stock by September 24, 2004.

(Doc. No. 63, Ex. F).

38

Plaintiffs respond that the truth about the Connellsville plant's problems began to leak out in August of 2004, while they still held the stock. Specifically, they argue that on August 2, 2004 and August 5, 2004, Anchor issued press releases about higher energy prices and the effect that the higher prices were having on the company.[28] Plaintiffs argue that Anchor's stock price dropped after the August 5, 2004 press release was issued. (Doc. No. 28, ¶145).

Thereafter, on November 5, 2004, Anchor issued another press release in which it reported that its third quarter 2004 results were affected by rising energy prices that resulted in higher raw materials costs, higher freight charges, and higher production costs that could not be passed through to customers. (Doc. No. 28, ¶ 151). Anchor noted that the higher energy costs included higher natural gas costs, higher transportation and raw material costs due to rising fuel prices, and lower energy billings to customers. (Doc. No. 28, ¶ 151). In the same press release, Anchor announced that its Connellsville plant would stop production, and Anchor would be taking a restructuring charge of $47-$57. (Doc. No. 28, ¶ 151). Anchor's stock dropped 27% on the day of the November 5, 2004 press release. (Doc. No. 28, ¶ 151).

Plaintiffs argue that the increased cost of freight was one of the problems that caused the Connellsville plant to lose money after it lost the Rolling Rock contract. Therefore, Steamfitters and Bellefeuille argue that they have adequately pled loss causation, since they held their stock when the August 2nd and 5th disclosures were issued.

The Court rejects Steamfitters and Bellefeuille's convoluted argument that they have adequately pled loss causation. The August 2004 press releases did not contain corrective

---

[28]Plaintiff does not include allegations regarding the August 2, 2004 press release in the complaint.

disclosures; i.e., the press releases did not correct an earlier misrepresentation.  Plaintiffs do not

allege that Anchor made any misrepresentations about its energy costs, and as such, the August

2004 press releases do not correct a previous misstatement.  The corrective disclosures regarding

the Connellsville plant occurred in the November 5, 2004 press release in which Anchor

announced that the assets of the Connellsville plant were impaired.  Steamfitters and Bellefeuille

did not hold any of Anchor's common stock at the time of the corrective disclosure, and as such,

they have not adequately alleged loss causation.  See Dura, 125 S. Ct. at 1631 (stating that if the

purchaser sells his stock before the relevant truth begins to leak out, the misrepresentation will

not have caused his loss).  As a result, only Plaintiff Zeller can proceed on the Section 10(b) and

Rule 10b-5 Claim regarding the asset impairment misstatement.

### B.  Section 11 Claim[29]

Plaintiffs stated at the hearing that their Section 11 Claim was based on the following

misstatements: (1) the inclusion of the series C preferred stock in the calculation of shareholders'

equity; (2) the mischaracterization of the PBGC payments in the statement of cash flows; (3) the

failure to write-down the value of the assets at the Connellsville plant prior to its closure; and (4)

the failure to disclose a contingent loss due to the loss of the Rolling Rock contract.  The Anchor

Defendants argue that Plaintiffs' Section 11 Claim should be dismissed, because (1) Plaintiff

---

[29]Section 11 provides a cause of action for any person acquiring a security issued pursuant
to a materially false registration statement, unless the purchaser knew about the false statement at
the time of the purchase.  See DeMaria v. Anderson, 318 F.3d 170, 175 (2d Cir. 2003); 15 U.S.C.
§ 77k (stating that if a registration statement "contained an untrue statement of a material fact or
omitted to state a material fact required to be stated therein or necessary to make the statements
therein not misleading, any person acquiring such security (unless it is proved that at the time of
such acquisition he knew of such untruth or omission) may . . . sue").

Zeller lacks standing to sue; (2) the statute of limitations bars this claim to the extent that it is

based on the shareholder's equity misstatement; and (3) Bellefeuille and Steamfitters have no

damages. Accordingly, the Court will address each argument.

### 1. Zeller's Standing

The Anchor Defendants argue that Zeller's Section 11 Claim should be dismissed,

because Zeller lacks standing to sue. Specifically, they argue that Zeller lacks standing because

he cannot demonstrate that the shares that he purchased were traceable to the prospectus.

On September 9, 2003, Anchor issued a prospectus in connection with its September 25,

2003 Offering. Zeller purchased his shares a year later, in September of 2004. (Doc. No. 63, Ex.

F). Zeller purchased his shares after Deneau and Campbell sold their shares on May 13, 2004,

and Deneau and Campbell's shares were not issued in connection with the Offering. (Doc. No.

28, ¶ 140; Doc. No. 63, Ex. G). Thus, the Anchor Defendants argue that it is impossible for

Zeller to trace his shares directly to the prospectus, since shares not issued in connection with the

Offering were on the market at the time of Zeller's purchase.

In order to have standing to sue under § 11, a plaintiff must show that his shares were

issued pursuant to the particular registration statement alleged to be defective. See Abbey v.

Computer Memories, Inc., 634 F. Supp. 870, 871 (N.D. Cal. 1986)(citations omitted).

Accordingly, "an aftermarket purchaser has standing to pursue a claim under section 11 so long

as he can prove the securities he bought were sold in an offering covered by the false registration

statement." Joseph v. Wiles, 223 F.3d 1155, 1159 (10th Cir. 2000). Thus, §11 claims can be

asserted "by those who can 'trace' their shares to the allegedly defective registration statement."

Demaria v. Andersen, 318 F.3d 170, 176 (2d Cir. 2003)(citations omitted). However, standing

41

cannot be based on a statistical tracing theory, i.e., by showing that there is a *very high probability* that the shares can be traced to the allegedly defective registration statement. See Krim v. PCOrder.com, 402 F.3d 489, 502 (5th Cir. 2005).

Zeller responds that Defendants' arguments raise issues beyond the scope of a motion to dismiss. The Court rejects this argument, because standing is an element of subject matter jurisdiction, which may be determined on a motion to dismiss. See id. at 494 (reviewing the district court's granting of a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) due to the plaintiffs' inability to trace their stock to the public offering). In considering a challenge to subject matter jurisdiction, this Court is "'free to weigh the evidence and resolve factual disputes in order to satisfy itself that it has the power to hear the case.'" Id. (quoting Montez v. Department of Navy, 392 F.3d 147, 149 (5th Cir. 2004)). Plaintiff Zeller has offered no evidence in support of his contention that the shares that he purchased are traceable to the prospectus, and as such, the Court finds that Zeller has not established that he has standing to pursue his Section 11 Claim. Therefore, the Court dismisses Zeller's Section 11 Claim without prejudice due to lack of subject matter jurisdiction.

## 2. Statute of Limitations

Next, the Anchor Defendants argue that to the extent that Plaintiffs' Section 11 Claim is based on the shareholders' equity misstatements, the claim should be dismissed because it is barred by the statute of limitations. The statute of limitations for section 11 claims provides that an action must be "brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m. These defendants argue that Anchor disclosed the fact that the

42

series C preferred stock was reclassified and should have been excluded from shareholder's equity in a November 3, 2003 press release[30], and as such, Plaintiffs' Section 11 Claim based on this misstatement is time-barred because it was not filed until November 24, 2004.[31]

A statute of limitations bar is an affirmative defense, and dismissal on this ground is appropriate only if it is apparent from the face of the complaint that the claim is time-barred. See La Grasta v. First Union Securities, Inc., 358 F.3d 840, 845 (11th Cir. 2004)(citations omitted). A section 11 claim must be brought within one year after the plaintiff has actual or inquiry notice that a violation has occurred. See id. at 846 (citing Theoharous v. Fong, 256 F.3d 1219, 1228 (11th Cir. 2001)). Inquiry notice means that the plaintiff has "'knowledge of the facts that would lead a reasonable person to begin investigating the possibility that his legal rights had been infringed.'" Id. (quoting Theoharous, 256 F.3d at 1228); see also In re USEC Securities Litigation, 190 F. Supp.2d 808, 817 (D. Md. 2002)(stating that "notice is triggered by evidence of the 'possibility' of untrue statements or omissions, and not by exposure of the wrongful conduct"). "'[I]nquiry notice does not begin to run unless and until the investor is able, with the exercise of reasonable diligence (whether or not actually exercised), to ascertain the information needed to file suit.'" Tello v. Dean Witter Reynolds, Inc., 410 F.3d 1275, 1283 (11th Cir. 2005)(quoting Marks v. CDW Computer Centers, Inc., 122 F.3d 363, 368 (7th Cir. 1997)). An "objective reasonable person standard" is applied when determining whether and when a plaintiff

---

[30]The reclassification of shareholders' equity was also disclosed in Anchor's Form S-4 Registration Statement dated November 3, 2003. (Doc. No. 61, Ex. 3, F-46).

[31]These defendants also argue that the statute of limitations should bar Plaintiffs' entire Section 11 claim. However, the Court need not reach this argument, since the Court finds that Plaintiffs' entire Section 11 Claim should be dismissed on other grounds.

has inquiry notice.  See id.

Plaintiffs respond that whether and when a plaintiff had sufficient facts to place him on inquiry notice is a question of fact that is often inappropriate to resolve on a motion to dismiss. See id. (citations omitted).  While, in general, Plaintiffs are correct, the facts show that they were on inquiry notice on November 3, 2003 when Anchor disclosed the fact that the series C preferred stock was reclassified and should have been excluded from shareholder's equity.  As such, the Court finds that to the extent that Plaintiffs' Section 11 Claim is based on the shareholder's equity misstatement, this claim is barred by the statute of limitations.[32]

### 3.  Bellefeuille and Steamfitters' Damages

Next, the Anchor Defendants argue that Bellefeuille and Steamfitters' Section 11 Claim should be dismissed, because Bellefeuille and Steamfitters have no damages.  Specifically, these defendants argue that based on the allegations in the complaint, it is clear that Bellefeuille and Steamfitters' losses were not caused by the alleged misstatements and omissions relating to the Connellsville plant and cash flows.

Plaintiffs correctly point out that they have no obligation to plead loss causation as a part of their prima facie Section 11 Claim.[33]  See In re WRT Energy Securities Litigation, 2005 U.S.

---

[32]Additionally, the Court notes that Bellefeuille did not buy any of his Anchor stock until November 7, 2003–after the disclosure about the shareholder's equity reclassification was made. (Doc. No. 63, Ex. F).  As such, Bellefeuille's losses could not have been caused by the shareholder's equity misstatements.

[33]Section 11 claims differ from section 10(b) claims with respect to pleading loss causation.  "In a Section 10(b) case, the plaintiff bears the burden of pleading loss causation." WRT Energy, 2005 U.S. Dist. LEXIS 18701, at * 5 (citation omitted).  In a section 11 case, the plaintiff does not have the burden of pleading loss causation, and instead, the burden is on the

Dist. LEXIS 18701, at *4 (S.D.N.Y. Aug. 30, 2005). Furthermore, Plaintiffs point out that once

a plaintiff has alleged that he purchased a security traceable to a registration statement containing

material misrepresentations, any decline in value is presumed to have been caused by the

misrepresentations in the registration statement. See id. (citation omitted); Abrams v. Van

Kampen Funds, Inc., 2005 U.S. Dist. LEXIS 531, at *30 (N.D. Ill. Jan. 13, 2005). Therefore, if

Plaintiffs state a claim under section 11, Defendants have the burden of proving negative

causation, i.e., they must show that the decline in the value of the stock was caused by something

other than the alleged misstatements. See Abrams, 2005 U.S. Dist. LEXIS 531, at *30-31; see

also 15 U.S.C. § 77k(e).

Defendants point out that dismissal is appropriate "[w]here it is apparent from the face of

the complaint that the plaintiff cannot recover her alleged losses." In re Merrill Lynch & Co.,

Inc. Research Reports Securities Litigation, 289 F. Supp.2d 429, 437 (S.D.N.Y. 2003); see also

Fortner v. Thomas, 983 F.2d 1024, 1028 (11th Cir. 1993). As such, Defendants argue that

Bellefeuille and Steamfitters' Section 11 Claim should be dismissed, because it is apparent from

the face of the complaint that Bellefeuille and Steamfitters cannot recover their alleged losses.

Accordingly, the Court will analyze each remaining misstatement that forms the basis of their

Section 11 Claim.

### a.  Cash Flow Misstatements

Defendants argue that it is apparent from the face of the complaint that Bellefeuille and

Steamfitters' losses did not result from the cash flow misstatements. The Court agrees with

---

defendant to show that the decline in the value of the stock was caused by something other than
the alleged misstatements. See id. at *5-6.

Defendants.

As previously explained, the cash flow misstatements (i.e., the improper classification of the PBGC payments) was revealed on March 29, 2005. However, Bellefeuille and Steamfitters sold all of their stock prior to this corrective disclosure. As such, Defendants have met their burden of proving negative causation based on the allegations in the complaint. See Dura, 125 S. Ct. at 1631 (stating that if the purchaser sells his stock before the relevant truth begins to leak out, the misrepresentation will not have caused his loss); In re McKesson HBOC, Inc. Securities Litigation, 126 F. Supp.2d 1248, 1262 (N.D. Cal. 2000)(finding that the defendants had an absolute negative causation defense with regards to shareholders who disposed of their stock prior to the date of the corrective disclosures); In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation, 272 F. Supp.2d 243, 255 (S.D.N.Y 2003)(stating that the decline in price that occurred prior to the disclosure of the allegedly concealed information could not be charged to the defendants); Akerman v. Oryx Communications, Inc., 810 F.2d 336, 342 (2d Cir. 1987)(stating that the price decline before disclosure could not be charged to the defendants)(citations omitted). Accordingly, the Court grants Defendants' motion to dismiss Bellefeuille and Steamfitters' Section 11 Claim to the extent that it is based on the cash flow misstatements.

### b. Connellsville Plant

Defendants argue that it is apparent from the face of the complaint that Bellefeuille and Steamfitters' losses did not result from the misstatements regarding the Connellsville plant (i.e., the failure to write-down the value of the assets and the failure to disclose a contingent loss due

46

to the loss of the Rolling Rock contract), because the truth about the Connellsville plant was

disclosed on November 4, 2004–after Bellefeuille and Steamfitters sold all of their stock.  See

Dura, 125 S. Ct. at 1631; In re McKesson, 126 F. Supp.2d at 1262; In re Merrill Lynch, 272 F.

Supp.2d at 255; Akerman, 810 F.2d at 342.[34]   Since the corrective disclosures relating to the

Connellsville plant did not occur while Bellefeuille and Steamfitters held their stock, Defendants

have met their burden of proving negative causation based on the allegations in the complaint.

Accordingly, the Court grants Defendants' motion to dismiss Bellefeuille and Steamfitters'

Section 11 Claim to the extent that it is based on the Connellsville plant misstatements.

### C. Section 15[35] Claim and Section 20(a)[36] Claim

Plaintiffs assert a Section 15 claim and Section 20(a) claim against certain Anchor

---

[34]Furthermore, as previously explained, the Court rejects Steamfitters and Bellefeuille's convoluted argument that the relevant truth began to leak out in the August 2004 press releases, which were issued while they held their stock.  As previously stated, the August 2004 press releases did not contain corrective disclosures; i.e., the press releases did not correct an earlier misrepresentation.

[35]Section 15 provides: "Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist." 15 U.S.C. § 77o.

[36]Section 20(a) provides: "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a).

Defendants[37] based on control person liability.  The Anchor Defendants argue that Plaintiffs'

Section 15 Claim and Section 20(a) Claim should be dismissed, because there is no underlying

securities violation.  See Theoharous, 256 F.3d at 1227; In re Bellsouth Corp. Securities

Litigation, 355 F. Supp.2d 1350, 1364 (N.D. Ga. 2005); In re Republic Services, Inc. Securities

Litigation, 134 F. Supp.2d 1355, 1363 (S.D. Fla. 2001).  Section 15 holds persons liable if they

control a person or entity that is liable under Section 11, and Section 20(a) holds persons liable if

they control a person or entity that is liable under Section 10(b) or Rule 10b-5.  Since the Court

has dismissed the underlying Section 11 Claim, the Court grants the Anchor Defendants' motion

to dismiss the Section 15 Claim.  However, since Zeller's Section 10(b) and Rule 10b-5 claim

remains to the extent that it is based on the failure to write-down the assets of the Connellsville

plant, the Court denies these defendants' motion to dismiss Zeller's Section 20(a) Claim.[38]

## IV.  The Underwriter Defendants[39] and PwC's Motion to Dismiss

Plaintiffs asserted a Section 11 Claim against PwC and the Underwriter Defendants.

However, since the Court has found that Plaintiffs' Section 11 Claim should be dismissed during

the analysis of the Anchor Defendants' motion to dismiss, the Court need not address PwC and

the Underwriter Defendants' motion beyond stating that their motions are granted for the reasons

---

[37]Plaintiffs assert their Section 15 Claim against Campbell and Deneau and their Section 20(a) Claim against Campbell, Deneau, and Reno.

[38]To the extent that Bellefeuille and Steamfitters asserted a Section 20(a) Claim, their claim is dismissed.

[39]The Underwriter Defendants consist of Credit Suisse First Boston, Merrill Lynch, and Lehman Brothers.

set forth above.[40]

## V.  Cerberus Defendants' Motion to Dismiss[41]

Plaintiffs assert a Section 15 claim and Section 20(a) claim against the Cerberus

Defendants[42] based on control person liability.  The Cerberus Defendants move to dismiss these

claims because (1) Plaintiffs have failed to allege the existence of an underlying primary

violation against Anchor; and (2) Plaintiffs have failed to allege particularized facts to support an

inference that the Cerberus Defendants had the power to control or influence Anchor's

accounting activities and practices that allegedly led to Anchor's purported primary violations of

the securities laws.  Accordingly, the Court will address each argument.

### A.  Underlying Primary Violation

The Cerberus Defendants argue that the control person liability claims should be

dismissed because there is no underlying primary violation by Anchor.   The Court has already

addressed this argument, which was made by the Anchor Defendants, and found that the Section

15 Claim should be dismissed, but Zeller's Section 20(a) Claim remains due to Zeller's

remaining Section 10(b) and Rule 10b-5 Claim based on the failure to write-down the assets of

the Connellsville plant.

---

[40]PwC and the Underwriter Defendants made the same arguments as the Anchor
Defendants regarding Zeller's standing, the statute of limitations, and Bellefeuille and
Steamfitters' damages.

[41]The Cerberus Defendants consist of Cerberus Capital Management, L.P., Cerberus
International, Ltd., Cerberus Institutional Partners, L.P., Cerberus Institutional Partners
(America), L.P., and Stephen Feinberg.

[42]The Section 20(a) Claim is asserted against all fo the Cerberus Defendants except
Cerberus International, Ltd.

## B.  Control Person Allegations

Next, the Cerberus Defendants argue that the control person liability claims should be

dismissed, because Plaintiffs have failed to allege particularized facts to support an inference that

the Cerberus Defendants had the power to control or influence Anchor's accounting activities

and practices that allegedly led to Anchor's purported violation of Section 10 (b) and Rule 10b-5.

Plaintiffs respond that they have adequately alleged such facts.

Plaintiffs allege the following in their complaint: According to the prospectus, the

Cerberus-related entities owned 91.6% of Anchor's common stock at the time of the Offering

and 96.87% of the series C participating preferred stock.  (Doc. No. 28, ¶ 49).  After the

Offering, Cerberus-related entities owned 62.78% of Anchor's common stock.  (Doc. No. 28, ¶

49).  Furthermore, the prospectus disclosed that Stephen Feinberg exercised sole voting and

investment  authority over all Anchor stock owned by Cerberus International, Ltd., Cerberus

Institutional Partners, L.P. and Cerberus Institutional Partners (America), L.P.  (Doc. No. 28, ¶

50).  Additionally, Feinberg exercised voting and investment authority over certain private

investment funds and managed accounts, which owned in the aggregate approximately 1,149,996

shares of Anchor common stock.  (Doc. No. 28, ¶ 50).  Anchor was a controlled company for

purposes of the Nasdaq stock market listing requirements due to Stephen Feinberg being the

beneficial owner of greater than a majority of the outstanding common stock of Anchor.  (Doc.

No. 28, ¶ 54).

Since a majority of the voting power of Anchor's stock was held by Cerberus-related

entities, Cerberus controlled the power to elect Anchor's directors, to appoint members of

management, and to approve all actions requiring the approval of the holders of Anchor's

common stock. (Doc. No. 28, ¶ 53). Cerberus had four representatives on Anchor's board of

directors[43]: two were on Cerberus' payroll as consultants, one was a Cerberus employee, and

another was a Cerberus appointee. (Doc. No. 28, ¶ 52). Furthermore, the rest of the members of

the board were recruited by Cerberus, but not compensated by Cerberus. (Doc. No 28, ¶ 52).

Furthermore, Plaintiffs allege the following:

> Defendants Campbell, Deneau, Cerberus Capital Management, L.P., Cerberus
> International, Ltd., Cerberus Institutional Partners, L.P., Cerberus Institutional
> Partners (America), L.P. and Stephen A. Feinberg were controlling persons of
> Anchor within the meaning of Section 15 of the Securities Act by reason of their
> respective management positions in Anchor, and/or their membership on
> Anchor's Board of Directors and/or their stock ownership and/or their
> participation throughout the Class Period in the day-to-day business affairs of
> Anchor. Because of their positions in the Company and/or their stock ownership,
> and/or because of their positions on the Anchor Board of Directors, these
> defendants had the power and influence to control the Company and caused
> Anchor to engage in the unlawful acts and conduct alleged herein.

*       *       *

> Defendants Campbell, Deneau, Reno, Cerberus Capital Management, L.P.,
> Cerberus International, Ltd., Cerberus Institutional Partners, L.P., Cerberus
> Institutional Partners (America), L.P. and Stephen A. Feinberg acted as
> controlling persons of Anchor within the meaning of Section 20(a) of the
> Exchange Act as alleged herein. By virtue of their high-level positions with the
> Company, participation in and/or awareness of the Company's operations and/or
> intimate knowledge of the Company's actual performance and/or stock ownership,
> these defendants had the power to influence and control and did influence and
> control, directly or indirectly, the decision-making of the Company, including the
> content and dissemination of the various statements which plaintiff contend are
> false and misleading. Defendants Campbell, Deneau and Reno were provided
> with or had unlimited access to copies of the Company's reports, press releases,
> public filings and other statements alleged by plaintiff to be misleading prior to

---

[43]At the hearing, the parties stated that the board had eight seats.

and/or shortly after these statements were issued and had the ability to prevent the
issuance of the statements or cause the statements to be corrected.

(Doc. No. 28, ¶ 117, 186).

A defendant is liable as a controlling person if he "'had the power to control the general affairs of the entity primarily liable at the time the entity violated the securities laws . . . [and] had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the primary liability.'" Brown v. Enstar Group, 84 F.3d 393, 396 (11th Cir. 1996)(quoting Brown v. Mendel, 864 F. Supp. 1138, 1145 (M.D. Ala. 1994)). Control "means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. 230.405. Whether a defendant is a control person is a fact intensive issue that is normally better suited for a motion for summary judgment than a motion to dismiss. See In re Unicapital Corp. Securities Litigation, 149 F. Supp.2d 1353, 1368 n.23 (S.D. Fla. 2001)(citation omitted); Higelman v. National Ins. Co. of America, 547 F.2d 298, 302 (5th Cir. 1977)(citations omitted); In re Cabletron Systems, Inc., 311 F.3d 11, 41 (1st Cir. 2002)(citation omitted).

The Cerberus Defendants argue that Plaintiffs have not alleged that they had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the primary liability, i.e., that they did not have the power to control or influence Anchor's accounting policies. Specifically, they argue that conclusory allegations based on director or shareholder status are insufficient. See Lilley v. Charren, 936 F. Supp. 708, 716 (N.D. Cal. 1996)(citations omitted); Primavera Familienstiftung v. Askin, 1996 WL 494904, at *10-11

52

(S.D.N.Y. Aug. 30, 1996); Interim Investors Committee v. Jacoby, 90 B.R. 777, 780 (W.D.N.C. 1988). Furthermore, the Cerberus Defendants argue that the control person allegations must be pled with particularity under Federal Rule of Civil Procedure 9(b), since the underlying primary violation sounds in fraud. The Court, however, is not persuaded that Rule 9(b) applies to the Section 20 control person claim. See In re Sahlen & Associates, Inc., Securities Litigation, 773 F. Supp. 342, 363 n.29 (S.D. Fla. 1991); In re Enron Corporation Securities, Derivative & ERISA Litigation. 2003 WL 230688, at *11-12 (S.D. Tex. Jan. 28, 2003).

With respect to the Cerberus Defendants' argument that Plaintiffs have not alleged that they had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the primary liability. the Court finds that the allegations are sufficient to withstand a motion to dismiss. Specifically. Plaintiffs have alleged that these defendants were majority shareholders that controlled four seats on the board of directors and that they were involved in Anchor's day-to-day business affairs. Defendants can challenge the accuracy of these allegations in a motion for summary judgment or at trial. As such. the Court denies the Cerberus Defendants' motion on this issue.

**VI. Conclusion**

Plaintiffs' Section 11 Claim is based on the following misstatements: (1) shareholders' equity; (2) cash flows; (3) failure to write-down the value of the assets at the Connellsville plant prior to its closure; and (4) failure to disclose a contingent loss due to the loss of the Rolling Rock contract. As explained above, the Court dismisses Zeller's Section 11 Claim without prejudice due to lack of subject matter jurisdiction. The Court also dismisses Bellefeuille and

Steamfitters' Section 11 Claim due to (1) the statute of limitations barring the claim to the extent

that it is based on the shareholders' equity misstatement, and (2) Defendants' showing that

Bellefeuille and Steamfitters' losses did not result from the cash flow or Connellsville plant

misstatements.  Since the Court is dismissing the entire Section 11 Claim, the Court is also

dismissing the Section 15 control person claim.

Plaintiffs' Section 10(b) and Rule 10b-5 Claim is based on: (1) the failure to write down

the assets of the Connellsville plant prior to the closing of the plant, and (2) the cash flow

misstatements.  As explained above, Bellefeuille and Steamfitters' Section 10(b) and Rule 10b-5

Claim is dismissed due to (1) their failure to adequately allege loss causation relating to the cash

flow and asset impairment misstatements, and (2) their failure to adequately allege scienter

relating to the cash flow misstatements.  Likewise, Zeller's Section 10(b) and Rule 10b-5 Claim

is dismissed to the extent that it is based on the cash flow misstatements due to the failure to

adequately allege scienter.  However, Zeller's Section 10(b) and Rule 10b-5 Claim remains to the

extent that it is based on the asset impairment misstatement; this is the only primary violation

claim that remains.  Since Zeller's Section 10(b) and Rule 10b-5 Claim remains in part, his

Section 20(a) control person claim remains.

According, it is ORDERED AND ADJUDGED that:

(1)     Defendant PricewaterhouseCoopers LLP's Motion to Dismiss (Doc. No. 51) is

        **GRANTED**;

(2)     The Underwriter Defendants' Motion to Dismiss (Doc. No. 56) is **GRANTED**;

(3)     The Cerberus Defendants' Motion to Dismiss (Doc. No. 58) is **GRANTED IN**

**PART AND DENIED IN PART**;

(4)     The Anchor Defendants' Joint Motion to Dismiss (Doc. No. 62) is **GRANTED**

**IN PART AND DENIED IN PART**; and

(5)     Plaintiff Zeller is directed to file a joint case management report by April 7, 2006.

**DONE AND ORDERED** at Tampa, Florida, this 6th day of March, 2006.

SUSAN C. BUCKLEW
United States District Judge

Copies to:
Counsel of Record

55